**THE TOLEDO GROUP, INC.**, Appellee and Cross–Appellant,

v.

**BENTON INDUSTRIES, INC.**, Appellant and Cross–Appellee.

[Cite as *The Toledo Group, Inc. v. Benton Industries, Inc.* (1993), 87 Ohio App.3d 798.]

Court of Appeals of Ohio,
Lucas County.

No. L–91–310.

Decided July 16, 1993.

*Jonathan Cherry,* for appellee and cross-appellant.

*Michael Urban, Roland Bauer, Julia Cain* and *John McHugh III,* for appellant and .cross-appellee.

MELVIN L. RESNICK, Judge.

This is an appeal and a cross-appeal from a judgment of the Lucas County Court of Common Pleas which granted the motion for summary judgment of appellee and cross-appellant, The Toledo Group, Inc. ("Toledo Group"), and awarded that entity $75,000. Appellant and cross-appellee, Benton Industries, Inc. ("Benton"), appeals that judgment and asserts the following assignments of error:

"Assignment of Error No. I

"The trial court erred in granting partial summary judgment in favor of the plaintiff-appellee, The Toledo Group, Inc., and in concluding that defendant-appellant, Benton Industries, Inc., breached the confidentiality agreement with plaintiff-appellee, because there was no breach under the terms of such agreement.

"Assignment of Error No. II

"The trial court's award of $75,000 to plaintiff-appellee, The Toledo Group, Inc., as damages for breach by defendant-appellant, Benton Industries, Inc., of the confidentiality agreement with plaintiff-appellee is unsupported by evidence in the record and plaintiff-appellee is therefore only entitled to nominal damages."

Toledo Group filed a cross-appeal raising two additional assignments of error, which are:

"I. The trial court erred in failing to grant summary judgment in favor of plaintiff-appellee upon its accomplishment fee agreement with defendant-appellant.

"II. The trial court erred in granting summary judgment in favor of defendant-appellant upon the accomplishment fee agreement."

In early May 1990, Patrick A. McGraw, of Toledo Group, contacted John C. Beringer, president of Benton, and inquired whether Benton would be interested in acquiring information concerning a bankrupt business, Riker Industries, Inc. ("Riker Industries"), which was for sale. Beringer expressed an interest in receiving information on Riker Industries.

On May 7, 1990, Beringer, in his corporate capacity, signed an agreement with Toledo Group which stated, in pertinent part:

"*If* the Purchaser [Benton] or any other person acting for the Purchaser or in the Purchaser's [Benton's] behalf, or any entity or group of or in which the Purchaser [Benton] is a principal or member, or *any individual, entity or group which is a principal or member of Purchaser [Benton] or of any related entity or group, purchases the Business, the Purchaser [Benton] agrees to pay to TG an accomplishment fee of $75,000.*" (Emphasis added.)

On May 11, 1990, Toledo Group and Benton entered into a second agreement. Pursuant to this "confidentiality agreement," Benton agreed, in material part:

"1. Information provided on the business by TG [Toledo Group] is sensitive and confidential; its disclosure to others would be damaging to the business and to TG's fiduciary relationship with the owner.

"2. For five years from the date hereof the undersigned will not disclose any information regarding the business, including the fact that it is for sale, to any other person who has not signed and dated *an agreement similar to this,* except to secure advice and counsel, in which case the undersigned agrees to obtain such advisor's consent to maintain strict confidentiality. All information will be returned promptly to TG without retaining any copies, summaries, analysis or extracts thereof, (i) at any time on request and, (ii) in any event upon termination of the undersigned's review of it." (Emphasis added.)

On May 11, 1990, Benton also signed a confidentiality agreement with National Bank of Detroit, Business Finance, Inc. ("NBD"), which was conducting the sale of the assets of Riker Industries. Toledo Group had previously entered into an identical confidentiality agreement with NBD on May 7, 1990.

After all agreements were signed, confidential information regarding Riker Industries was released to Benton. In addition, McGraw took Beringer on a tour of Riker Industries. McGraw also did further investigation in order to answer

questions posed by Beringer. When Riker Industries was sold at auction on May 21, 1990, Benton did not offer a bid on the company. However, Beringer appeared at the auction with Brenlin Group, Inc. ("Brenlin"), which placed the successful bid for Riker Industries. Immediately after the federal district court confirmed the purchase of Riker Industries by Brenlin, Beringer turned a file folder containing information provided to Benton by Toledo Group over to Jack A. Marsillo, an acquisition specialist employed by Brenlin and a member of Brenlin's bidding team.

Toledo Group subsequently billed Benton for payment of the agreed-upon $75,000 accomplishment fee. When payment was not made, Toledo Group filed a complaint which alleged that Beringer was both the president and a shareholder of Benton and an agent and employee of Brenlin at the bankruptcy auction, *i.e.*, that Benton and Brenlin were related entities. The complaint contained a prayer for relief in the amount of the accomplishment fee, $75,000. Benton filed an answer acknowledging that a contract had been signed on its behalf by Beringer but denying that any fee was owed because the purchase of Riker Industries by Benton itself was a "condition precedent" to the promise to pay the $75,000 fee.

Both parties filed motions for summary judgment. Toledo Group asserted that no question of fact existed as to whether Riker Industries was purchased by a "related entity" and, therefore, that Benton breached the fee agreement. Toledo Group further argued that no question of fact existed on the issue of whether the confidentiality agreement was breached because Beringer acted as an "agent" for Brenlin in the bidding process and turned confidential information acquired through Toledo Group over to an employee of Brenlin. For these reasons, Toledo Group requested a partial summary judgment on the question of liability.

Benton, in its motion for summary judgment, contended that the facts offered in Beringer's deposition, answers to interrogatories and exhibits demonstrated that Benton and Brenlin are two distinct corporate entities which are not related at the corporate level. Benton further argued that no evidence was offered to establish that Beringer disclosed any information provided by Toledo Group to anyone other than himself and that the file was not provided to Brenlin until after the sale was confirmed.

On May 22, 1991, the trial court filed an opinion and judgment entry in which it ruled against Toledo Group and for Benton on the issue of whether Brenlin was related to Benton. The trial court held that Brenlin was not related to Benton. However, the trial court ruled for Toledo Group and against Benton on the issue of whether the confidentiality agreement was breached and scheduled a separate hearing to determine what damages were suffered. Before the hearing was conducted, both parties filed motions for reconsideration, which were denied by the trial court in an opinion and judgment entry filed on July 2, 1991.

At the damages hearing, McGraw testified that he did not keep time records during the course of the Toledo Group/Benton relationship. No evidence of the reasonable value of the services provided or of any damages flowing from the alleged breach of the confidentiality agreement was offered. Toledo Group insisted that due to the breach it was entitled to the entire accomplishment fee amount of $75,000. At the conclusion of the hearing, and in a subsequent judgment entry, the trial court awarded Toledo Group $75,000 in damages.

The two assignments of error raised by Benton on direct appeal relate to the question of whether the trial court erred when it ruled that the confidentiality agreement between the parties was breached, entitling Toledo Group to $75,000 in damages.

In granting Toledo Group's motion for partial summary judgment, the trial court found that the confidentiality agreement between Toledo Group and Benton was breached because Beringer admitted that "less than two weeks after signing the confidentiality agreement, he gave a representative of Brenlin his file containing all the information plaintiff had given him regarding Riker." In its motion for reconsideration, Benton asserted that the confidentiality agreement was not breached because the information was provided to a person who had signed and dated a similar confidentiality agreement. This assertion was supported by the affidavit of Marsillo, who attested to the fact that Brenlin had learned from a third party about the closing of Riker Industries on April 20, 1990. After several direct contacts with Riker Industries, Marsillo, as an agent of Brenlin, signed a confidentiality agreement with NBD. This agreement, dated May 3, 1990, is identical to the one signed by Beringer/Benton and NBD on May 11, 1990 and reads in pertinent part:

"In connection with our possible interest in purchasing substantially all of the assets (the 'Assets') of Riker Industries, Inc. ('Riker'), you intend to provide us with certain information, orally and in writing, which is either non-public, confidential and/or proprietary in nature (the 'Confidential Information'). As used herein, the term 'Confidential Information' shall include, without limitation, technical information and specifications relating to Riker's products, manufacturing and engineering processes, financial information and projections, sales statistics, processes, methods, inventions, research and development, future business plans, specifications, schematic drawings, flowcharts, pricing information, customer lists, trade secrets, know-how, technology referral sources, marketing and sales techniques, operations manuals, and any and all secret or confidential information directly or indirectly relating to the company's business, suppliers, customers and products and components thereof. We understand that the sole purpose of the Confidential Information is to assist us in deciding whether we wish to submit an offer or bid for the acquisition of the Assets. In consideration

of you[r] furnishing us with the Confidential Information, we agree to the following:

"1. For a period of three (3) years after the date of this Confidentiality Agreement, the Confidential Information will be kept confidential and shall not, without your prior written consent, be disclosed by us, or by our agents, representatives, employees, attorneys, accountants or financial advisors, in any manner whatsoever, in whole or in part, to any person or entity, and shall not be used by us, our agents, representatives, employees, attorneys, accountants and financial advisors, other than in connection with the described transaction. The Confidential Information shall be maintained by us in trust in a fiduciary capacity for the sole use and benefit of you. The Confidential Information and all records and other materials pertaining to it, whether or not developed by us, shall remain the exclusive property of Riker and/or NBD Business Finance, Inc. ("NBD/BF"). Moreover, we agree to reveal the Confidential Information only to our agents, representatives, employees, attorneys, accountants, and financial advisors who need to know the Confidential Information for the purpose of evaluating this transaction, who are informed by us of the confidential nature of the Confidential Information and who shall agree to be bound by the terms and conditions of this Confidentiality Agreement. We shall be responsible and liable to you for any breach of this Confidentiality Agreement by our agents, representatives, employees, attorneys, accountants or financial advisors."

The trial court, in denying the motion for reconsideration, found that the agreement signed by Brenlin "contained different terms and parties" and was, therefore, not similar to the Toledo Group/Benton confidentiality agreement.

In its first assignment of error, Benton maintains that the trial court erred in finding that the NBD/Brenlin and Toledo Group/Benton agreements were not similar agreements. Benton argues, in essence, that the agreements were similar as a matter of law. Thus, Benton concludes the trial court erred in granting the motion for summary judgment on the issue of the breach of the confidentiality agreement.

Any court in Ohio contemplating whether summary judgment is appropriate in a case must follow the provisions of Civ.R. 56(C), which reads, in material part:

"Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion

and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

In this case the trial court was required to construe the provisions of a confidentiality agreement, that is, a contract, in order to reach its decision.

The interpretation of a written contract is a matter of law for the court. *Alexander v. Buckeye Pipeline Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of contract construction is to effectuate the intent of the parties. *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language they chose to employ in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Common words appearing in the instrument will be given their plain and ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the contract. *Alexander, supra,* at paragraph two of the syllabus.

The confidentiality agreement, which was originally drafted by McGraw, an attorney, allows the disclosure of the information provided by Toledo Group to any person who has signed and dated an "agreement similar to this." The word "similar" is defined as "1. having characteristics in common: strictly comparable 2: alike in substance or essentials." Webster's Ninth New Collegiate Dictionary (1990) 1098. "Analogous" and "parallel" are synonyms for "similar." *Id.* If this plain and ordinary meaning of "similar" is applied to the Toledo Group/Benton agreement, it appears that Benton could disclose confidential information to any person who had signed and dated an agreement which was like in substance and essentials. Thus, the two agreements would not be required to contain the same terms or be entered into by the same parties. Rather, as in the case before us, where different persons entered into separate agreements for the purpose of protecting the confidentiality of information and agreed to disclose the same to only those bearing a like obligation, the substance and essentials of those agreements could be deemed "similar." However, this application would lead to absurd results *and* flies in the face of the overall contents of the Toledo Group contract. The role of Toledo Group in this case is that of a "business opportunity finder." A business finder is one who " 'finds, interests, introduces, and brings parties together for a transaction which they themselves negotiate and consummate.' " *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 5, 540 N.E.2d 257, 262, quoting Scharf, Shea & Beck, Acquisitions, Mergers, Sales, Buyouts and Takeovers (1985) 39. In essence, a finder is a middleman who is in the business of selling information which he has developed himself. *Legros, supra.* Thus, the business

finder's stock in trade is his confidential information. *Id.* Consequently, the ultimate purpose of the agreement required by Toledo Group was to protect its stock in trade. This is especially true in the context of a bankruptcy sale where the subject business will be sold to the bidder who has the information necessary to present a bid closest to the amount desired by the trustee and/or seller.

A reading of the overall contents of the Toledo Group/Benton confidentiality agreement reveals that its ultimate purpose is to protect Toledo Group's stock in trade. The agreement precludes the copying, extraction, etc. of any of the information provided, requires the return of the information to Toledo Group, and prohibits direct contact with the subject business or anyone related thereto. The confidentiality agreement also contains a disclaimer as to the accuracy of the information supplied by Toledo Group and requires "independent verification" of the same by the signer of the document prior to consummation of a transaction. These provisions emphasize Toledo Group's role as a middleman and focus upon the importance of its product, *i.e.*, information developed by Toledo Group. As a result, if persons who entered into a confidentiality agreement with Toledo Group could freely communicate provided information with any other person who signed a "similar" agreement with another finder, broker or seller, the entire purpose of the Toledo Group confidentiality agreement would be frustrated. It could also lead to the absurd, and dangerous, result of allowing these persons to pool information and subvert the bidding process. As a consequence, we conclude that the term "similar" in the Toledo Group confidentiality agreement must be construed to mean an identical agreement regarding the same transaction entered into by Toledo Group and another person.

The evidence offered showed that Brenlin never entered into such an agreement with Toledo Group. It is undisputed that confidential information supplied by Toledo Group was turned over to Brenlin. Accordingly, no question of fact exists as to whether the confidentiality agreement was breached and the trial court did not err in granting summary judgment on the issue of liability. Benton's first assignment of error is found not well taken.

In its second assignment of error, Benton argues that the damages awarded to Toledo Group are unsupported by the evidence. We agree.

Damages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract. *R & H Trucking, Inc. v. Occidental Fire & Cas. Co.* (1981), 2 Ohio App.3d 269, 272, 2 OBR 298, 301, 441 N.E.2d 816, 819; *Deitsch v. The Music Co.* (1983), 6 Ohio Misc.2d 6, 7, 6 OBR 546, 547, 453 N.E.2d 1302, 1303, citing *Hadley v. Baxendale* (1854), 9 Exch. 341, 156 Eng.Rep. 145. A reviewing court has the authority to reverse a damages award if it is manifestly against the

weight of the evidence. *Schendel v. Bradford* (1922), 106 Ohio St. 387, 394, 140 N.E. 155, 157.

In the case before us, the court's judgment is premised upon the fact that Beringer "gave a representative of Brenlin his file containing all the information plaintiff [Toledo Group] ha[d] given him regarding Riker." It is uncontradicted that this exchange occurred *after* the purchase of Riker Industries by Brenlin was consummated. There is no evidence in the record that this breach of the confidentiality agreement caused any loss to Toledo Group. It did not affect the purchase. Further, Toledo Group failed to demonstrate the reasonable value of services provided or any other type of injury. Consequently, we are presented with a situation in which a legal wrong occurred but no actual damage resulted from the breach. In a case where the "legal right * * * to be vindicated * * * has produced no actual loss of any kind, or where, from the nature of the case, some injury has been done, the extent of which the evidence fails to show," the complaining party may recover nominal damages. *Lacey v. Laird* (1956), 166 Ohio St. 12, 1 O.O.2d 158, 139 N.E.2d 25, paragraph two of the syllabus. "Nominal damages" are some small amount of money, such as $1. *Lacey, supra*, at 21, 1 O.O. at 162, 139 N.E.2d at 31. Even awards in the $100 to $200 range are considered too substantial to qualify as "nominal" damages. *Id.* Therefore, it is inconceivable that $75,000 could be considered "nominal damages."

Toledo Group asserts, nonetheless, that the $75,000 award is warranted because Beringer became an agent of Brenlin and used confidential information provided by Toledo Group to assist Brenlin in effectuating the purchase of Riker Industries. This argument must fail. There is no evidence in the record that Beringer was acting in his corporate capacity for Benton when he appeared on the Brenlin bidding team. Beringer testified that Brennan asked him to appear with Brenlin as a personal favor only after Beringer informed Toledo Group that Benton would not be interested in purchasing Riker Industries if Brenlin was interested in purchasing Riker Industries. The only claims raised in this case are based upon alleged breach of contract *by Benton*. Therefore, conduct engaged in by Beringer in his individual capacity cannot serve as a basis for a finding of a breach of the confidentiality agreement by Benton. Hence, we find that the award of $75,000 in damages is not supported by any competent, credible evidence and must be reversed. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Benton's second assignment of error is found well taken.

In its two assignments of error on cross-appeal, Toledo Group contends that no genuine issue of fact exists as to whether Brenlin is a "related entity" to Benton within the meaning of the accomplishment fee agreement. Thus, it

concludes that Benton's motion for summary judgment on this issue should have been denied and Toledo Group's motion should have been granted. When Benton filed a motion for summary judgment in the trial court, it filed several documents in support of the motion, including its answers to interrogatories sent by Toledo Group. Included in the answers was the following statement:

"There is no relationship between Benton Industries, Inc. and * * * [Brenlin]. There is a relationship between Benton Industries, Inc. and David L. Brennan, who has an ownership interest in * * * [Brenlin]. As noted above and below, Mr. Brennan owns fifty shares in Benton Industries, Inc., and serves as a Director and Chairman of the Board. There is no relationship between Benton Industries, Inc. and any wholly or partially owned subsidiary or affiliates of * * * [Brenlin]."

Benton put into issue, with the summary judgment motion, the question of whether there was any relationship between Brenlin and Benton. Furthermore, Benton provided a complete denial of any relationship. The burden rested with Toledo Group to show evidence that some relationship did indeed exist between the two companies in question. See *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, at paragraph three of the syllabus. The evidence produced by Toledo Group demonstrated that (1) Beringer was a former employee of Brenlin and had occasionally been hired by Brenlin as a consultant; (2) David Brennan, who has ownership interests and management responsibilities in Brenlin, is a shareholder in Benton and chairman of the board; (3) Brennan is both the former employer and close personal friend of Beringer; and (4) Beringer, acting out of friendship with Brennan, appeared at the bankruptcy court with the Brenlin bidding team. Toledo Group argues that these pieces of information are enough to demonstrate that a material issue of fact remains in dispute. Toledo Group also maintains that the trial court used the wrong standard to determine the meaning of "related" because the trial court referred to the provision of Title 17 of the Ohio Revised Code instead of referring to the definition of "related" as found in a dictionary. We are not persuaded by either argument.

 As pointed out by Toledo Group, the parties to this agreement were sophisticated in business matters. Both parties entered into a business contract, which must be construed in a business sense, as would be understood by persons of intelligent affairs. *Erie R.R. Co. v. Ohio Pub. Serv. Co.* (C.A.6, 1932), 62 F.2d 83, 84. A review of the applicable law shows no contemplation that companies shall be considered related based upon the existence of a common shareholder, a past employment by one company of a second company's current president, or on the basis of a close personal and family friendship between management personnel from two separate companies. See, generally, 11 Ohio Jurisprudence 3d

(1979), Business Relationships, Sections 300–310, at 548–559. The language used in the relevant clause clearly reflects a knowledge of business entities and their various relationships. No evidence was offered from which one could infer that *Brenlin* is an entity which is a principal or member of Benton or of any related entity or group. For this reason, the trial court did not err in granting Benton's motion for summary judgment on this issue and in denying Toledo Group's motion for summary judgment on this issue.

Toledo Group's first and second assignments of error on cross-appeal are found not well taken.

The judgment of the Lucas County Court of Common Pleas is affirmed in all respects with the exception of the award of damages. That judgment is reversed. Pursuant to App.R. 12(C), the damages award is ordered vacated and the judgment which should have been entered is as follows:

"The Toledo Group, Inc. is awarded nominal damages in the amount of $10.00 for the breach of the confidentiality agreement and court costs."

This cause is remanded to the Lucas County Court of Common Pleas for entry of judgment. Court costs of this appeal are assessed equally between Benton Industries, Inc. and The Toledo Group, Inc.

*Judgment affirmed in part*
*and reversed in part.*

GLASSER, P.J., and HANDWORK, J., concur.